IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HOLBROOK MFG LLC, an Illinois limited liability company; EFG HOLDINGS, INC., a Delaware corporation; ELGIN FASTENER GROUP LLC, a Delaware limited liability company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. _____ |
| v. | ) ) | |
| RHYNO MANUFACTURING INC., an Illinois corporation; DEREK KUHNS, an individual; and SHAWN KUHNS, an individual, | ) ) ) ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiffs Holbrook Mfg LLC, EFG Holdings, Inc., and Elgin Fastener Group LLC ("Plaintiffs"), by and through their undersigned attorneys, for their complaint against defendants Rhyno Manufacturing Inc., Derek Kuhns, and Shawn Kuhns ("Defendants"), allege as follows:

### **PARTIES**

1.      Plaintiff Holbrook Mfg LLC ("Holbrook") is an Illinois limited liability company with its principal place of business in Wheeling, Illinois.  Holbrook is sometimes known as Holbrook Manufacturing, Inc., or Holbrook Mfg., Inc.

2.      EFG Holdings, Inc. ("EFG Holdings") is a Delaware corporation with its principal place of business in Wheeling, Illinois.

3.      Elgin Fastener Group LLC ("EFG") is a Delaware limited liability company with its principal place of business in Wheeling, Illinois.

4.      Defendant Rhyno Manufacturing Inc. ("Rhyno") is an Illinois corporation with its principal place of business in Wheeling, Illinois.

5.     Defendant Derek Kuhns resides in Illinois.  He is a former employee of Holbrook and is currently employed by or otherwise affiliated with Rhyno.

6.     Defendant Shawn Kuhns resides in Illinois.  He is a former employee of Holbrook and is currently employed by or otherwise affiliated with Rhyno.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1121, and 35 U.S.C. § 292, in that Plaintiffs' claims arise under the Lanham Act, 15 U.S.C. §1125(a),  and the federal False Marking statute, 35 U.S.C. § 292.  The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that at least one of the Defendants reside in this district and all Defendants are residents of Illinois, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## ALLEGATIONS COMMON TO ALL COUNTS

**Plaintiffs' Acquisition of Holbrook Mfg., Inc.**

9.     EFG Holdings and EFG, through various operating subsidiaries, are North America's leading providers of engineered fastening solutions, serving blue-chip wholesalers, distributors, and original equipment manufacturers.  The EFG group of companies are the largest single-source suppliers of specialty fasteners in the nation.

10.     Prior to January 2016, Holbrook Mfg., Inc., located in Wheeling, Illinois, was a specialty manufacturer and distributor of fasteners, including custom engineered and specialty products for commercial and industrial applications.

11.     At that time, Holbrook Mfg., Inc. was owned and controlled by four principal shareholders, including Donald Kuhns, the father of defendants Shawn and Derek Kuhns.  At the

time, Shawn Kuhns was employed by Holbrook Mfg., Inc. as an Engineering Manager and Derek Kuhns was employed by Holbrook Mfg., Inc. in an inside sales position.

12.     Pursuant to an Equity Purchase Agreement ("Purchase Agreement") dated January 4, 2016, EFG Holdings acquired Holbrook Mfg., Inc. for approximately **[Redacted]**.  A copy of the Purchase Agreement is attached as Exhibit A.[1]

13.     Upon information and belief, as a shareholder in Holbrook Mfg., Inc., Donald Kuhns **[                    Redacted                    ]**.  Donald Kuhns **[                    Redacted          ]** Fastener Group Holdings, LLC, an indirect parent of EFG Holdings.

14.     Concurrent with the execution of the Purchase Agreement, EFG entered into a written employment agreement (the "Employment Agreement") with Donald Kuhns, pursuant to which he was to be employed as a Project Manager by EFG or one of its subsidiaries.  A copy of the Employment Agreement is attached as Exhibit B.

15.     As part of the acquisition, Holbrook Mfg., Inc. was merged into plaintiff Holbrook Mfg LLC ("Holbrook"), with Holbrook as the surviving entity.  Holbrook is an indirect wholly-owned subsidiary of EFG, which in turn is a wholly-owned subsidiary of EFG Holdings.

16.     Following the acquisition of Holbrook Mfg., Inc. and its merger into Holbrook, Holbrook continued to employ many of the former Holbrook Mfg., Inc. employees, including for some time Shawn Kuhns as Engineering Manager and Derek Kuhns in an inside sales position.

---

[1] In compliance with the confidentiality provisions of the Purchase Agreement, that document is being filed under seal and the confidential terms of the Purchase Agreement are redacted from the public version of this Complaint.

**Confidentiality, Non-Compete, and Non-Solicitation Agreements**

17.     As is typical in any acquisition, Plaintiffs, as the buyers, were interested in ensuring that they would continue to enjoy the economic benefits and value of the Holbrook business and goodwill, for which they paid millions of dollars.  In particular, Plaintiffs had a right to expect that, after paying the former shareholders handsomely for the business, those same former shareholders would not simply set up a new company to compete with Holbrook, and then use their customer contacts, knowledge of the business and its confidential information, and knowledge of and contacts with employees to equip and operate a new company, take away customers and sales, and hire away key employees, all of which could completely destroy the value and good will Plaintiffs had paid for.

18.     To protect those legitimate interests, the Purchase Agreement contained confidentiality, non-competition, and non-solicitation provisions, prohibiting Donald Kuhns and the other selling shareholders, referred to as "Equityholders" in the Agreement, from, among other things, setting up or associating with any competing business, using or disclosing any of Plaintiffs' confidential information, soliciting customers, or soliciting or hiring away the company's employees.

19.     For example, Section 5.4 of the Purchase Agreement provides in relevant part that: "Each Equityholder will treat and hold as confidential all of the Confidential Information and refrain from disclosing or using any of the Confidential Information except in connection with this Agreement."  "Confidential Information" is defined by the Purchase Agreement as:

> [A]ll information (whether or not specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by any Equityholder as an owner of Capital Stock of NewCo[2] or the Company[3], as an employee or consultant

---

[2] As used in the Purchase Agreement "NewCo" was Holbrook Mfg Holdings, Inc., which is the parent company of plaintiff Holbrook.

[3] As used in the Purchase Agreement, "the Company" was plaintiff Holbrook.

of the Company or any of its Subsidiaries, in the performance of duties for, or on behalf of, NewCo, the Company or any of its Subsidiaries that relates to the Business or the business or research of NewCo, the Company, its Subsidiaries or any of their respective investors, officers, directors, employees or equityholders or their respective Affiliates, including, without limitation: (i) internal business information (including, without limitation, information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, NewCo, the Company, its Affiliates and their confidential information; (iii) industry research compiled by, or on behalf of NewCo, the Company or any of its Subsidiaries, including, without limitation, identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, NewCo, the Company or any of its Subsidiaries; (iv) compilations of data and analyses, processes, methods, track and performance records, data and data bases relating thereto; (v) computer software documentation, data and data bases and updates of any of the foregoing; and (vi) the terms of this Agreement and the transactions contemplated hereby except for disclosure required by Legal Requirement, provided, however, "Confidential Information" does not include (a) any information that is or has become generally known to and generally available within the industry other than as a result of the acts or omissions of such Equityholder in breach of this Agreement; or (b) is disclosed or made available by a third party without restriction and without breach of any relationship of confidentiality.

(Ex. A pp. 53-54.)

20. Section 5.5 of the Purchase Agreement contained non-competition and non-solicitation provisions designed to protect Plaintiffs' legitimate interests, as purchasers of the Holbrook business, in the company's business and goodwill from unfair competition by Holbrook Mfg., Inc.'s former shareholders, including Donald Kuhns, and/or their affiliates. Section 5.5(a)-(c) provide:

(a) Non-Competition. Each Equityholder agrees and acknowledges that he is familiar with the trade secrets and other Confidential Information of the Company, its Subsidiaries, their

5

respective business and their respective business relations. Each Equityholder also agrees and acknowledges that Buyer and its Affiliates would be irreparably damaged if such Equityholder were to provide services or to otherwise participate in the operations or business of any Person competing with the Business, the Company, and its Subsidiaries following the Closing in a similar business and that any such competition would result in a significant loss of goodwill by Buyer in respect of the Business and the Equity. Each Equityholder further agrees and acknowledges that (i) the covenants and agreements set forth in this Section 5.5 are a material inducement to Buyer to enter into this Agreement and to perform its obligations hereunder, and that Buyer would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if such Equityholder breached any of the provisions of this Section 5.5, and (ii) in order to assure Buyer that the Business, NewCo, the Company and its Subsidiaries following the Closing will retain their value, it is necessary that each Equityholder undertake not to utilize his special knowledge of the Business and such Equityholder's relationship with clients or customers to compete with the Company for the Restricted Period. Therefore, in further consideration of the amounts to be paid hereunder on the Closing Date in exchange for the Business, and the Equity, including the goodwill of the Business sold in connection therewith, each Equityholder agrees that from and after the Closing Date and continuing for five (5) years from the Closing Date (the "Restricted Period"), he will not, and will cause each of his Affiliates not to, directly or indirectly, either for himself or through any other Person, as an employee, agent, consultant, director, equityholder, manager, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, be employed by or participate in any manner in, act as a consultant or advisor to, render services for (alone or in association with any Person), permit such party's name to be used by any enterprise that engages in or participates in, or otherwise assist any Person that engages in or owns, invests in, operates, manages or controls any venture or enterprise that directly or indirectly engages or proposes to engage anywhere within North America (including Canada, the United States of America and Mexico), Central America, South America, Europe, Australia or Asia (the "Territory") in all or any portion of the business of developing, engineering, sourcing, manufacturing, marketing, supplying, distributing or selling precision fasteners (collectively, the "Restricted Business"). Nothing contained herein will be construed to prevent an Equityholder from being employed by or providing services to the Company or Buyer following the Closing or investing in the stock

of any competing Person listed on a national securities exchange or traded in the over the counter market so long as such party is not involved in the business of such Person and such party does not own more than two percent (2%) of the equity of such Person.

(b)     Non-Solicitation of Business Relations. Without limiting the generality of the provisions of Section 5.5(a), each Equityholder hereby agrees that during the Restricted Period such Equityholder will not, and will cause each of his Affiliates not to, directly or indirectly, through another Person, as employee, agent, consultant, director, equityholder, manager, co-partner or in any other capacity without Buyer's prior written consent, solicit business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company or any of its Subsidiaries during the one (1) year period preceding the Closing Date, or from any successor in interest to any such Person, in any case for the purpose of securing business or contracts related to the Restricted Business.

(c)     Non-Solicitation and No-Hire of Employees. During the Restricted Period, each Equityholder will not, and will cause each of his Affiliates not to, directly or indirectly, as employee, agent, consultant, director, equityholder, manager, co-partner or in any other capacity without the prior written consent of Buyer, employ, hire, engage, recruit or solicit for employment or engagement (other than by a general solicitation advertisement, posting or similar job solicitation process not targeting the employees of the Company or any of its Subsidiaries as of the Closing), any Person who is (or was during the one (1) year period preceding the Closing Date) employed or engaged by the Company or any of its Subsidiaries or otherwise seek to interfere with, influence or alter any such Person's relationship with the Company or any of its Subsidiaries.

(Ex. A § 5.5 (a)-(c).)

21.     Donald Kuhns' Employment Agreement with EFG contained confidentiality provisions similar to those in the Purchase Agreement. (Ex. B ¶ 4(a).) It also contained similar non-competition, non-solicitation, and no-hire provisions, except that the term of those restrictions lasted only for 12 months following the termination of his employment. (Ex. B ¶ 4(b)-(c).)

22.     While employed by Holbrook, Shawn and Derek Kuhns, like many other Holbrook Employees, accepted and agreed to the terms of the Elgin Fastener Group Employee Handbook (the "Handbook").  Their signed acknowledgments and corresponding copies of the relevant portions of the Handbook are attached hereto as Exhibits C and D.[4]

23.     The Handbook contained the following confidentiality provisions aimed at protecting Holbrook's confidential and proprietary information, both during and after employees' employment with Holbrook:

> CONFIDENTIAL NATURE OF WORK
> All EFG records and information relating to EFG or its customers are confidential, and employees must treat all matters accordingly. Employees are prohibited from using or disclosing confidential information relating to the Company's business, or the business of any of EFG's customers, except where an employee does so for a proper purpose, on a strict need-to-know basis, in the conscientious performance of an employee's job responsibilities. An employee may be required to sign a separate confidentiality agreement further confirming his or her adherence to this obligation. Employees must maintain the confidentiality of confidential information entrusted to EFG employees by EFG or its customers, except when disclosure is authorized by the Company's counsel or required by laws or regulations. Confidential information includes all non-public information that might be of use to competitors, or harmful to EFG or its customers, if disclosed. It also includes information that suppliers and customers have entrusted to EFG. Employees may also not use or share any confidential information obtained from previous employers. The obligation to preserve confidential information continues even after employment ends. Confidential information includes, but is not limited to the following:
> - Information that the Company is required by law, agreement, regulation or policy to maintain as confidential (including customer information or information concerning government examinations or audits).
> - Employees' medical, personnel and payroll records.
> - Information that could help others commit fraud, misuse the Company's products and services, or damage the Company's business or the business of its customers.

---

[4] EFG and Holbrook consider much of the contents of the Handbook to be confidential and have not included in Exhibits B and C the portions that are not directly relevant to the allegations of the Complaint.  Full and complete copies can be made available to the Court or Defendants upon request.

- The identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts, prices, renewal dates and other detailed terms of customer and supplier contracts and proposals.
- Information not generally known to the public upon which the goodwill, welfare and competitive ability of the Company depends, including information regarding product plans and designs, marketing and sales plans and strategies, pricing policies, information about costs, profits and sales, and other confidential information relating to the business of the Company.
- Information about the Company's business plans, including forecasts, budgets, acquisition models and other non-public financial information, management policies, information about possible acquisitions or dispositions and other business and acquisition strategies and policies. It is a violation of the Company's policy for any employee to disclose, use, release or discuss any confidential information belonging to the Company or its customers both during and after the employees' association with the Company. It is also a violation of the Company's policy for an employee to use any confidential information for the employee's own use or use such information in any way inconsistent with the Company's interests. The files, manuals, reports, notes, lists and other records or data of the Company, in any form, are the exclusive property of the Company and must be returned at the end of employment with the Company. Also, all correspondence files, business files, customer and prospect lists, price lists, manuals, technical data, forecasts, budgets, customer materials, employee files, and other material that contain confidential information must be returned.

Employees are expected to advise management immediately of any observed or suspected breach of this policy.

(Exs. C and D, Handbook pp. 12-13.)

24. The Handbook also strictly prohibited employee conflicts of interest as follows:

CONFLICT OF INTEREST
Employees should avoid any situation which involves, may involve, or appear to involve a conflict between their personal interest and the interest of the Company. As in all other facets of their duties, employees dealing with customers, suppliers, contractors, competitors or any person doing or seeking to do business with the Company are to act in the best interest of the

9

> Company. Each employee shall make prompt and full disclosure in
> writing to their manager of any potential situation which may
> involve or appear to involve a conflict of interest.

(Exs. C and D, Handbook p. 12.)

**Defendants' Wrongful Conduct -- Summary**

25.     Beginning in April or May 2020, and continuing through the present, defendants Derek and Shawn Kuhns, along with known and unknown cohorts, formed defendant Rhyno to directly compete with Holbrook. In violation of their contractual obligations outlined above, they have used Holbrook's confidential and proprietary information to essentially replicate Holbrook's operations and manufacturing capacity in Rhyno's new facilities, located just a few blocks from Holbrook's Wheeling operations, to manufacture and sell the exact same types of custom and specialized fasteners as Holbrook.

26.     Also in violation of the Kuhns' contractual obligations as outlined above, they and Rhyno have used Holbrook's confidential and proprietary information to contact and solicit Holbrook's customers, independent sales representatives, and vendors, and to raid and hire away Holbrook's employees, including at least one key employee with highly technical knowledge and confidential information belonging to Holbrook.

27.     On information and belief, Donald Kuhns, the father of Derek and Shawn, has been employed by or affiliated with Rhyno in some capacity and has provided aid and assistance to his sons and their new venture, all in violation of Donald's non-competition, non-solicitation, and other contractual obligations as outlined above. Derek and Shawn Kuhns are and have acted as the altar egos of their father Donald Kuhns.

28.     Defendants have also engaged in an ongoing pattern of unfair and deceptive trade practices, including the misappropriation and use of the unregistered **Holbrook™** trademark,

10

which they blatantly incorporated into Rhyno's website code in an attempt to divert Holbrook's customers from Plaintiffs' websites to Rhyno's.

29. Defendants blatantly copied a large amount of proprietary content and images from EFG's website and used it to populate Rhyno's website, increasing the likelihood of confusing customers, vendors, and others as to the source and origin of Rhyno's products.

30. Defendants have engaged in a range of other unfair and deceptive practices aimed at misrepresenting Rhyno's products and services, causing confusion in the marketplace, and unfairly competing with Plaintiffs. These include false and misleading statements regarding Rhyno's status as a licensed supplier of products sold by Holbrook and as an ISO 9001:2015 certified manufacturer, false patent and trademark claims, and other deceptive practices likely to cause confusion in the marketplace as to Rhyno's affiliation or association with Holbrook, certain of Holbrook's licensors and licensed products, and the origin, sponsorship, or approval of Rhyno's products and services.

**The Kuhns' Formation of Rhyno**

31. On April 8, 2020, Derek Kuhns was terminated from his sales position at Holbrook.

32. Shortly thereafter, on May 13, 2020, defendant Rhyno Manufacturing Inc. ("Rhyno") was incorporated as an Illinois corporation.

33. Upon information and belief, Derek Kuhns was associated with and involved in the formation and operation of Rhyno from its inception.

34. Upon information and belief, Donald Kuhns was also associated with and involved, directly or indirectly, individually or through his son or sons, in the planning, formation, financing, and/or operation of Rhyno from early on.

11

35. On August 5, 2020 Rhyno registered a URL and domain name for https://www.rhynomfginc.com.

36. Five days later, on August 10, 2020, Shawn Kuhns abruptly resigned his position as Engineering Manager with Holbrook and walked out with no advance notice.

37. On information and belief, Shawn Kuhns immediately went to work for Rhyno.

38. On information and belief, Shawn Kuhns was providing assistance to or was otherwise working with Rhyno and its employees or agents, including Derek and/or Donald Kuhns, while Shawn was still employed and being paid by Holbrook.

39. On or about August 20, 2020, Rhyno's website went online and was available to the public.

40. Rhyno's website made it clear that Rhyno was established as a direct competitor to Plaintiffs, with many of the exact same types of products and services, and with products, services, and a business model copied directly from Holbrook.

**Misrepresentations on Rhyno's Original Website**

41. Rhyno's original website stated that Rhyno was a licensed supplier of TORX® and TORX PLUS® branded fasteners.

42. Those statements were false.

43. In fact, Rhyno was not at the time and never has been a licensed supplier of TORX® or TORX PLUS® fasteners.

44. Holbrook, on the other hand, has been a licensed supplier of TORX® and TORX PLUS® fasteners for many years.

45. Rhyno's original website also stated that Rhyno was a licensed supplier of ACR Phillips II®, Phillips Square-Driv®, Phillips®, and Phillips 1A® System fasteners.

46. Those statements were false.

12

47.     In fact, Rhyno was not at that time a licensed supplier of ACR Phillips II®, Phillips Square-Driv®, Phillips®, or Phillips 1A® System fasteners.

48.     Holbrook, on the other hand, has been a licensed supplier of ACR Phillips II®, Phillips Square-Driv® , Phillips®, and Phillips 1A® System fasteners for many years.

49.     Rhyno's original website also stated that Rhyo was a licensed supplier of Taptite®, Powerlok®, Plastite®, and Remform® fasteners.

50.     Those statements were false.

51.     In fact, Rhyno was not at that time a licensed supplier of Taptite®, Powerlok®, Plastite®, or Remform® fasteners.

52.     Holbrook, on the other hand, has been a licensed supplier of Taptite®, Powerlok®, Plastite®, and Remform® fasteners for many years.

53.     The TORX®,TORX PLUS® Phillips Square-Driv®, ACR Phillips II®,  , Phillips®, Phillips 1A®,   ®Taptite®, Powerlok®, Plastite®, and Remform® lines of fasteners are important and profitable product lines for Holbrook.

54.     Rhyno's deceptive practices threaten to or already have caused Holbrook to lose revenue and profit from the sale of those products.

55.     Rhyno's original website also stated that Rhyno was a licensed supplier of other name brand fasteners for which Holbrook is a licensee.  Upon information and belief, those statements were also false at the time they were made.

56.     Rhyno's original website stated that Rhyno was ISO 9001:2015 certified.

57.     That statement was false at the time it was made.

58.      On or about August 24, 2020, Rhyno disabled and took down its original website, after Acument Intellectual Properties LLC ("Acument"), the owner of the TORX® and TORX

PLUS ® trademarks, complained to Rhyno about its false claims to be a TORX® and TORX

PLUS ® licensee.

**Rhyno's Amended Website**

59.     On or about September 23, 2020, Rhyno's website went live again and was again

available to the public.

60.     After having been caught lying about its affiliations, the new version of Rhyno's

website removed some of those most obvious misrepresentations from its main navigation page,

but then built in metadata into the code of the website designed to promote the same

misrepresentations and false affiliations.

61.     For example, Rhyno's amended website has embedded the TORX® trademark

into its URL and code to continue to give the false impression that it is a supplier of TORX® and

TORX PLUS® branded fasteners, which it is not.  The following are screenshots of portions of

Rhyno's website code, the first taken on or about September 25, 2020 and the second taken on or

about October 5, 2020:

view-source:https://www.rhynomfginc.com/products

3","n86qf":"d434fb_3a485cecd747c4c2d2af99b5344b2998_795","d5rr1":"d434fb_b1bf5ab286a504f67db30d1e
079042a5_794","clp0a":"d434fb_f8f464604e477c8c4f05235fb6e42f6456","mainPage":"d434fb_725029f311
23caeb8eac9b2dc47578_26_823","cwmmk":"d434fb_9278faeff06792fecfcfe3c0d452103_792","1_931":"d434fb
_c695c270251000d6320893eda8ee2036_816","tgtal":"d434fb_76d03b9553b2df716d25cc9daab075a7_794","rge
a6":"d434fb_efb08c72965571a9d156b991e836b371_795","bvm44":"d434fb_a63757c5fd4220eea7a315e3c4dc7ba
4_655","c5ju3":"d434fb_329261e66f0b935b8e7b272bcee0e139_797","pg1ds":"d434fb_5e02315f690541d0bb47
6a62ec698e09_796"},"routes":{"./torx-plus":{"type":"Static","pageid":"cj0kz"},"./build-a-quote":
{"type":"Static","pageId":"c6gq9"},"./remform-fasteners":
{"type":"Static","pageId":"basdo"},"./custom-tapping-screws":
{"type":"Static","pageId":"glyav"},"./taptite-ii-fasteners":

view-source:https://www.rhynomfginc.com/products

62.     The result is that customers searching for a TORX® or TORX PLUS® supplier on the internet will be misdirected to Rhyno's website, even though Rhyno is not a licensed TORX® or TORX PLUS® supplier and does not and cannot sell TORX® or TORX PLUS® branded fasteners, as illustrated below:



63.     Rhyno also plagiarized large amounts of content from TORQ®'s and TORX PLUS® website and copied it to Rhyno's website.

64.     The purpose and effect of these practices has been to cause confusion and mistake and to deceive customers, including actual and potential Holbrook customers, into believing that

15

Rhyno is a licensed TORX® and TORX PLUS® supplier, and then to sell customers one of Rhyno's competing fasteners.

65.     Rhyno's amended website claims that an "AUTOSERT® feature" is a "patented feature" of Rhyno's 6-LOBE PLUS drive system and a "6-LOBE PLUS® Drive exclusive."

66.     Those statements are false and misleading.

67.     In fact, Rhyno does not own any patent or patent rights in the AUTOSERT® feature, which is patented by Acument as a patented feature of it TORX PLUS® drive systems. Rhyno has no right to use that patented feature in its 6-LOBE PLUS drive system, and that feature is by no means "exclusive" to Rhyno's 6-LOBE PLUS system.

68.     Holbrook, on the other hand, is a licensed supplier of TORX PLUS® drive systems with the AUTOSERT® feature.

69.     Rhyno's use on its website of the federal trademark symbol ® with its 6-LOBE PLUS product name is also false and misleading in that 6-LOBE PLUS is not a federally registered trademark.

70.     Rhyno's amended website uses and misappropriates the unregistered **Holbrook™** trademark by, among other things, incorporating it into Rhyno's website code, as illustrated in the follow screenshot:

16



71.    Using the Holbrook name and mark in Rhyno's website metadata and code could misleadingly divert actual and potential Holbrook customers to Rhyno's website, causing a loss of sales and good will.

72.    Rhyno's website also contains what appears to be Rhyno's email address for its sales operation, which appears on the website as sales@rhynomfginc.com.  When internet users click on that email address, however, it populates the "To" box in the corresponding email with sales@holbrookinc.com.

73.    Rhyno sought to further confuse and deceive actual and potential customers by blatantly copying a large amount of proprietary content and images from Holbrook and EFG's

websites and using it to populate Rhyno's website.  Examples of that copying are attached as Exhibit E.

**Use of Plaintiffs' Confidential Information**

74.     Defendants have repeatedly and improperly used Plaintiffs' confidential information, which the Kuhns defendants and other former Holbrook employees acquired while employed by Holbrook, to unfairly compete with Plaintiffs and raid Holbrook's workforce.

75.     Defendants have engaged in a concerted effort to use the Kuhns' knowledge of Holbrook's confidential information to raid Holbrook's employees.  The confidential employee information includes without limitation employee contact information and information regarding employees' positions, technical and other skills, specific roles in the design and manufacturing process, salaries, and wages.

76.     This employee information is confidential and generally not available to Plaintiffs' competitors.

77.     Defendants have improperly used this confidential information to contact and attempt to recruit numerous Holbrook employees, including key employees with technical skills and/or inside knowledge of Holbrook's operations, systems, customers, products, pricing, costs, and overall operations.

78.     In August and September 2020 alone, Rhyno hired away 5 Holbrook employees, including Shawn Kuhns, Holbrook's Engineering Manager, and Jesse Arambula, a key highly skilled toolmaker essential to Holbrook's business.  Rhyno has contacted and made offers of employment to untold numbers of other Holbrook employees.

79.     The loss of employees is extremely damaging to Holbrook, in terms of the loss of highly skilled trained employees, the costs of recruiting and training replacements, and because

the lost employees bring with them to Rhyno more and more of Holbrook's confidential and proprietary information.

80.     Defendants have repeatedly used Plaintiffs' confidential information to contact and solicit Plaintiffs' customers.

81.     Plaintiffs' confidential customer information includes, without limitation, the identities of the customers themselves, the names and identities of key contact persons, their contact information, customer preferences and purchasing information, product preferences, customer needs and plans, and other confidential information.

82.     None of this customer information is public or readily available to Holbrook's competitors.  Plaintiffs are careful to guard and not disclose this information.

83.     Defendants Derek and Shawn Kuhns had access to and knowledge of Holbrook's confidential customer information.  They and Rhyno have improperly used the information to contact and solicit Holbrook's customers, including some of Holbrook's largest customers, and to encourage them to switch their business to Rhyno.

84.     Defendants have also used Holbrook's confidential information to contact and solicit Holbrook's suppliers, licensors, and manufacturer representatives.  The confidential information used by Defendants includes the identity of the key suppliers and representatives, the names and identities of key contact persons, their contact information, pricing, royalty, and commission information, costs, purchasing and sales volumes, and other confidential information.

85.      This supplier, licensor, and representative information is not public nor readily available to Holbrook's competitors.  Plaintiffs are careful to guard and not disclose this information.

86.     Defendants have misappropriated Plaintiffs' confidential and proprietary blended costing model and copied and implemented it at Rhyno.  This costing model is a differentiator for Holbrook, giving it a competitive advantage over its competitors.  Defendants' misappropriation of Holbrook's costing model threatens to destroy that competitive advantage.

87.     Defendants have used the Kuhns' knowledge of Plaintiffs' confidential information to essentially replicate virtually every aspect of Holbrook's business and operations, from the manufacturing operation to product selection, website content, costing model, target customers, target employees, target manufacturer's representatives, suppliers, and other vendors.

**Harm and Threatened Harm to Plaintiffs**

88.     Defendants' wrongful conduct has caused and threatens to continue to cause damage and irreparable harm to Plaintiffs, including without limitation loss of good will and competitive advantages, lost employees, and irreparable harm from Defendants' interference with Plaintiffs' intellectual property rights, customers, customer relationships, and relationships with employees, licensors, manufacturer's representatives, suppliers, and other vendors.

89.     Plaintiffs have no adequate remedy at law for the harm and threatened harm caused by Defendants' actions.

90.     Plaintiffs have contacted Defendants and demanded that they cease and desist from the above improper conduct.  Through counsel, Defendants claimed that they removed false and misleading statements and information from Rhyno's amended website, but they did not in fact do so, and most or all of the offending information remains on the website.  Defendants refused to cease their improper use of Holbrook's confidential information or other improper conduct outlined above.

## COUNT I
### (Lanham Act § 43(a) – All Defendants)

91.     Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

92.     Defendants conduct is in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

93.     Holbrook has used its unregistered **Holbrook™** trademark to promote its specialty and custom-designed fasteners for many years, and the mark has come to be closely associated in the marketplace with Holbrook's high-quality, custom, and specialty products and quality service.

94.     Defendants' use of Holbrook's unregistered **Holbrook™** trademark on Rhyno's website infringes Holbrook's trademark and is likely to cause confusion or mistake, or to deceive customers and potential customers as to Rhyno's affiliation, connection, or association with Holbrook, or as to the origin, sponsorship, or approval of Rhyno's products, services, or other commercial activities.

95.     Defendants' copying of Holbrook's and EFG's website content and images onto Rhyno's website is likely to cause further confusion or mistake, or to deceive customers and potential customers as to Rhyno's affiliation, connection, or association with Holbrook, or as to the origin, sponsorship, or approval of Rhyno's products, services, or other commercial activities.

96.     Defendants also made false designations of origin and false and misleading statements of fact on Rhyno's original website that are likely to cause confusion or mistake, or to deceive customers and potential customers as to Rhyno's affiliation, connection, or association

with others, or as to the origin, sponsorship, or approval of Rhyno's products, services, or other commercial activities, including the following:

    a)   that Rhyno is a licensed supplier of TORX® and TORX PLUS® branded fasteners;

    b)   that Rhyno was a licensed supplier of ACR Phillips II®, Phillips Square-Driv®, Phillips®, and Phillips 1A® System fasteners;

    c)   that Rhyno was a licensed supplier of Taptite®, Powerlok®, Plastite®, and Remform® fasteners; and

    d)   that Rhyno was ISO 9001:2015 certified.

97.     Defendants continued use of the TORX® and TORX PLUS® trademarks and name by embedding it into Rhyno's amended website is also likely to cause confusion or mistake, or to deceive customers and potential customers as to Rhyno's affiliation, connection, or association with others, or as to the origin, sponsorship, or approval of Rhyno's products, services, or other commercial activities.

98.     One purpose and effect of Defendants' deceptive use of the above content and registered and unregistered trademarks on Rhyno's website is to misleadingly divert internet users, including Plaintiffs' actual and potential customers, to Rhyno's website and away from Plaintiffs'.

99.     Rhyno's statements on its amended website that the "AUTOSERT® feature" is a "patented feature" of Rhyno's 6-LOBE PLUS drive system and a "6-LOBE PLUS® Drive exclusive," are false and misleading and are likely to cause confusion or mistake, or to deceive customers and potential customers as to Rhyno's affiliation, connection, or association with others, or as to the origin, sponsorship, or approval of Rhyno's products, services, or other commercial activities.

100.     Rhyno's use on its website of the federal trademark symbol ® with its 6-LOBE PLUS product name is also false and misleading in that 6-LOBE PLUS is not a federally

22

registered trademark.  Said use is likely to cause confusion or mistake, or to deceive customers and potential customers.

101.     Defendants made the above statements and engaged in the above deceptive conduct with actual intent to mislead and deceive members of the public, including Holbrook's actual and potential customers.

102.     Defendants' actions occurred in and affect interstate commerce.  Rhyno's website is available worldwide.  Plaintiffs market and sell their products throughout the United States and other parts of the world.  Rhyno's marketing and sales efforts likewise are aimed at the United States and other markets.

103.     Plaintiffs have been or are likely to be damaged by Defendants' conduct, including irreparable harm caused by the actual or potential loss of customers, sales, and good will.

104.     Plaintiffs have no adequate remedy at law for the wrongful actions of Defendants.

105.     This is an exceptional case entitling Plaintiffs to recover their costs and attorneys' fees in that Defendants' conduct has been willful, intentional, illegal, unusually egregious, and in total disregard for Plaintiffs' rights and the rights of others.

## COUNT II
### (False Patent Marking, 35 U.S.C. § 292 – Rhyno)

106.     Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

107.      Rhyno has made false statements in its website advertising to the effect that the "AUTOSERT® feature" is a "patented feature" of Rhyno's 6-LOBE PLUS drive and a "6-LOBE PLUS® Drive exclusive."

108.    Rhyno did not have the consent of the patent holder, Acument, to make the statements at issue or to use any reference to Acument's patent on Rhyno's website or other advertising.

109.    Rhyno made the above statements with the purpose and intent of deceiving the public, including actual and potential customers, and inducing them to believe that Rhyno holds a patent on the referenced feature of Rhyno's 6-LOBE PLUS drive system.

110.    Rhyno's statements constitute false patent marking in violation of 35 U.S.C. § 292.

111.    Holbrook has suffered a competitive injury by reason of Rhyno's conduct in that, among other things, Holbrook is an authorized supplier of products covered by the Acument-patented AUTOSERT® feature and Rhyno's misrepresentations have caused confusion in the marketplace regarding Rhyno's status and affiliation and have allowed Rhyno to unfairly compete and gain unfair competitive advantages.

### COUNT III
### (Illinois Uniform Deceptive Trade Practices Act – All Defendants)

112.    Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

113.    Defendants' conduct as alleged above constitutes deceptive trade practices in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, in that it:

a)  causes confusion or misunderstanding as to the source, sponsorship, approval, or certification of Rhyno's goods and services;

b)  causes likelihood of confusion or misunderstanding as to the affiliation, connection, association or certification by others;

c)  represents that Rhyno's products and services have sponsorship and approval that they do not have; and

d) creates a likelihood of confusion and misunderstanding.

114. Plaintiffs have been or are likely to be damaged by Defendants' conduct, including irreparable harm caused by the actual or potential loss of customers, sales, and good will.

115. Plaintiffs have no adequate remedy at law for the wrongful actions of Defendants.

116. Plaintiffs are entitled to recover their costs and attorneys' fees in that Defendants' conduct has been willful.

**COUNT IV**
**(Breach of Contract – Derek and Shawn Kuhns)**

117. Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

118. The Handbook was widely distributed to EFG and Holbrook employees and its terms were agreed to and acknowledged by Derek and Shawn Kuhns, both of whom continued employment with Holbrook after acknowledging that the terms of the Handbook governed their employment.

119. The Handbook created a valid and enforceable contract.

120. Holbrook and EFG are entitled to enforce the terms of the Handbook, including its conflict of interest and confidentiality provisions.

121. Derek and Shawn Kuhns breached the confidentiality provisions of the Handbook, as set forth above, by using and disclosing to Rhyno and others EFG and Holbrook's confidential information and using it to unfairly compete with Plaintiffs and raid Plaintiffs' employees.

25

122.    On information and belief, Shawn Kuhns breached the conflict of interest provisions of the Handbook by assisting and/or otherwise working with Rhyno while he was still employed by Holbrook.

123.    Plaintiffs have complied with all obligations required of them under the Handbook.

124.    As a direct and proximate result of the Kuhns' breaches, Plaintiffs have been damaged in amounts to be determined at trial, including irreparable harm caused by the disclosure and use of Plaintiffs' confidential information.

## COUNT V
### (Tortious Interference With Contracts – All Defendants)

125.    Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

126.    Defendants knew at all relevant times that Donald Kuhns was subject to contracts with Plaintiffs that precluded him from directly or indirectly, individually or through others, competing with Plaintiffs, soliciting Plaintiffs' customers or employees, or using or disclosing Plaintiffs' confidential information.

127.    On information and belief, Defendants intentionally interfered with the contracts between Plaintiffs and Donald Kuhns, and facilitated his violation of his contractual obligations, by encouraging and working with him to associate himself with Rhyno, in direct competition with Plaintiffs, and to disclose and use Plaintiffs' confidential information for Rhyno's benefit.

128.    Upon information and belief, Defendants' intentional interference caused and/or resulted in Donald Kuhns' breaching his contractual duties to Plaintiffs, including those arising under the Purchase Agreement and Employment Agreement as set forth above.

129.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in amounts to be determined at trial, including irreparable harm caused by the disclosure and use of Plaintiffs' confidential information.

130.     Defendants' misconduct was intentional, outrageous, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages in amounts to be determined at trial, as necessary to deter Defendants and others from such outrageous and harmful conduct.

**COUNT VI**
**(Tortious Interference With Contracts -- Rhyno)**

131.     Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

132.     Rhyno knew at all relevant times that Derek and Shawn Kuhns were subject to contracts with Holbrook that precluded them from using or disclosing Plaintiffs' confidential information.

133.     Rhyno intentionally interfered with those contracts, and facilitated the Kuhns' violation of their contractual obligations, by encouraging and working with them to disclose and use Plaintiffs' confidential information for Rhyno's benefit and, on information and belief, by causing Shawn Kuhns to work and associate with Rhyno while he was still employed by Holbrook.

134.     Rhyno's intentional interference caused and/or resulted in the Kuhns' breaching their contractual duties.

135.     As a direct and proximate result of Rhyno's conduct, Plaintiffs have been damaged in amounts to be determined at trial, including irreparable harm caused by the disclosure and use of Plaintiffs' confidential information.

136.    Rhyno's misconduct was intentional, outrageous, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages in amounts to be determined at trial, as necessary to deter Rhyno and others from such outrageous and harmful conduct.

**COUNT VII**
**(Tortious Interference With Prospective Economic Advantage – All Defendants)**

137.    Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

138.    Plaintiffs had and have a reasonable business expectancy and ongoing relationship with their customers, employees, licensors, and manufacturer representatives.

139.    Defendants had and have knowledge of Plaintiffs' business expectancies and relationships.

140.    Defendants wrongfully and intentionally, through improper means, interfered with Plaintiffs' expectancies by, among other things, using Plaintiffs' confidential information to contact and solicit Plaintiffs' customers and employees, and raiding and hiring away Holbrook's employees.

141.    Defendants also wrongfully and intentionally, through improper means, interfered with Plaintiffs' expectancies by, among other things, engaging in the acts of unfair competition, and unlawful and deceptive practices alleged above, designed to unfairly compete with Plaintiffs and interfere with Plaintiffs' relationships and future business with its customers, licensors, and manufacturer's representatives.

142.    Defendants' intentional interference has caused the loss of economic expectancies through the loss of employees and good will, and threatens to cause the loss of expectancies in relationships and future sales with customers, licensors, and manufacturer's representatives.

143.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in amounts to be determined at trial, including irreparable harm caused by the disclosure and use of Plaintiffs' confidential information and loss of good will.

144.    Defendants' misconduct was intentional, outrageous, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages in amounts to be determined at trial, as necessary to deter Defendants and others from such outrageous and harmful conduct.

### COUNT VIII
### (Unfair Competition -- All Defendants)

145.    Plaintiffs reallege and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

146.    Defendants' conduct as alleged herein constitutes unfair competition in that such conduct involves the use and implementation of wrongful, unlawful, and unfair business practices in violation of Plaintiffs' established rights and which are designed to provide and have provided Defendants with unlawful and unfair competitive advantages.

147.    Defendants have and will continue to benefit from such conduct.

148.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, including irreparable harm caused by the loss of customers, sales, and good will.

149.    Defendants' misconduct was intentional, outrageous, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages in amounts to be determined at trial, as necessary to deter Defendants and others from such outrageous and harmful conduct.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants as follows:

A.    Awarding damages pursuant to each of the above claims in favor of Plaintiffs and against all Defendants in amounts to be determined at trial;

      B.      Pursuant to 15 U.S.C. § 1117(a), awarding Plaintiffs treble damages for Defendants' willful Lanham Act violations;

      C.      Directing an accounting and forfeiture and disgorgement of Rhyno's and/or the other Defendants' profits;

      D.      Granting a temporary restraining order and preliminary and permanent injunctions against Defendants and anyone acting in concert with them from violating Plaintiffs' rights or engaging in further acts of infringement or unfair competition, including without limitation from using or disclosing Plaintiffs' confidential information; contacting or soliciting Plaintiffs' customers, employees, vendors, or licensors; working or associating in any way with Donald Kuhns in further violation of his contractual rights; misusing or misappropriating Plaintiffs' or others' trademarks; engaging in further acts of misrepresentation or deception through Rhyno's website or otherwise; or otherwise competing with Plaintiffs through unfair, deceptive, or other wrongful means;

      E.      Awarding punitive damages in favor of Plaintiffs and against Defendants in an amount to be determined at trial;

      F.      Awarding Plaintiffs pre-judgment and post-judgment interest;

      G.      Awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action; and

      H.      Granting Plaintiffs such additional relief as this Court deems appropriate.

Respectfully Submitted,


By: /s/ Bradley P. Nelson
One of the Attorneys for Plaintiffs

Bradley P. Nelson
FisherBroyles LLP
225 West Washington St., Suite 2200
Chicago, IL 60606
312-300-4005
brad.nelson@fisherBroyles.com